**SO ORDERED.**

**SIGNED this 16th day of October, 2012.**

_____
**LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE**

_____

# United States Bankruptcy Court

**Western District of Texas
San Antonio Division**

| *In re* | BANKR. CASE NO. |
|---|---|
| WILLIAM A. OLDEN AND CONNIE G. OLDEN | 11-50599 |
| *Debtors* | Chapter 7 |
| BRYON MEIN AND JENNIFER MEIN<br><br>    *Plaintiffs,*<br>v.<br><br>WILLIAM A. OLDEN AND CONNIE G. OLDEN<br>    *Defendant.* | ADV. NO. 11-05064 |

**JUDICIAL FINDINGS OF FACT AND MEMORANDUM DECISION**

**Findings of Fact**

1. The Plaintiffs are Bryon and Jennifer Mein.
2. The Defendants are William and Connie Olden.

3. Defendant constructed a residence on the 1416 Clairmont Drive property in 2002 and resided there until it was sold to the Plaintiffs.
4. The original construction of the residence met all requirements of the city of Kerrville.
5. On November 29, 2007 Defendants sold Plaintiffs the property and residence located at 1416 Clairmont Drive in Kerrville, TX, 78028, for $370,000.00.
6. The Defendants signed a Seller's Disclosure Notice form regarding the 1416 Clairmont Drive property on October 29, 2007. The Disclosure is a standard form used in real estate transactions and conforms to the Texas statute regarding the sale of property among individuals. The form indicated the property had never experienced any of the following conditions:
    1) Intermittent or weather springs;
    2) previous flooding;
    3) soil movement;
    4) improper drainage or
    5) settling
7. A property inspection report performed on October 25, 2007, showed no problems relating to the drainage or improper grading of the property.
8. In December 2002, Defendants commissioned a Geotechnical Engineering Report from professional engineers Arias & Associates. Arias & Associates who thoroughly examined the property and took borings from multiple locations.
9. Defendants provided the Arias Report to the Plaintiffs prior to the purchase of the house.
10. The Arias Report disclosed that the soil on the 1416 Clairmont Drive property was expansive clay that shrinks when it loses water and swells or grows in volume when it gets wet, and has a high level of plasticity.
11. The swelling and shrinkage of the soil observed by the Meins was consistent with this report.
12. As recommended by the Arias Report, the foundation of the residence was built up on a pad of dirt and soil prior to the construction of the house. The Defendant represented this fact to the Plaintiff, stating that the foundation had been designed consistent with the Arias Report's recommendations.
13. No recommendations were made by the Arias Report regarding the yard surrounding the residence, and Defendant made no representations regarding the yard. The Arias Report's recommendations focused on creating adequate drainage away from the residence and its foundation.
14. To achieve adequate drainage, the Arias Report recommended "roof drainage should be controlled by gutters and carried well away from the structure. The ground surface adjacent to the building perimeter should be sloped a minimum of two percent away from the buildings sufficient to cause positive surface flow or drainage away from the building perimeter and entryway slabs." No gutters were installed, a condition that was apparent to the Meins and their inspector prior to the purchase.
15. Neither Plaintiff nor Defendant called any expert witnesses in this case to testify regarding drainage properties, the nature of the soil, the status, design, construction, or performance of the foundation, or the nature of damages to the property by any cause. No competent evidence of causation was submitted.
16. Daily and monthly rainfall records were submitted to the court, but provided no discernible pattern or level of rain necessary to establish causation or damages with

16. regard to standing water, flooding, or any other water related issue. No expert testimony was offered on these issues.
17. No evidence was presented of any estimated cost to repair or construction to alleviate the complained of conditions. The only evidence presented came from the Defendant, who testified, based only on speculation from his limited experience in the construction business, that a French drain might alleviate some problems, at a non-expert estimate of cost of $3,500 to $5,000.
18. A report by the city of Kerrville detailing complaints regarding flooding that occurred in the summer and early fall of 2007 was submitted. 1416 Clairmont Drive was not listed on this report as a site of flooding complaints. No property on Clairmont Drive at all was listed as having flooding complaints.
19. Photographs and testimony submitted were sufficient to demonstrate standing water exists from time to time at 1416 Clairmont Drive during the time the Plaintiffs resided there. The evidence was insufficient to demonstrate that actual flooding occurred on the property, either when the Plaintiff or the Defendant resided there.
20. The Plaintiff presented an audio recording of a phone conversation made with the Defendant, recorded without the knowledge of the Defendant, seeking to discover the extent of the Defendant's knowledge of the allegations. When taken as a whole, the conversation demonstrates the Defendant was aware of standing water while he resided there. The testimony does not support a finding that there was "improper drainage" as that phrase would have been understood by a reasonable person as it appeared on the disclosure form. Defendant had no knowledge of any issue with the foundation, or drainage within the confines the residence or adjacent garage itself.
21. Aerial photographs showed that changes in tree coverage on adjacent properties had occurred from when the Defendants occupied the property opposed to the Plaintiffs. The area surrounding 1416 Clairmont Drive property and neighboring plots had changed, but the evidence was not sufficient to demonstrate the changes did or did not substantially alter the drainage of water from the house.
22. The Plaintiffs were able to refinance the property in 2011, after the alleged water-based problems were apparent. The Plaintiffs did not disclose this information to the lender, and did not disclose any information regarding foundation problems or possible flooding to the lender.
23. The Plaintiffs provided eye-witness testimony to demonstrate flooding had occurred in the yard at various times. The testimony was unconvincing.
24. The Plaintiffs did not have any complaints about the property at any point until 2010. The entire complaint about the property rests on the presence of the standing water and the fact that the Defendants checked the standard disclosure form,.
25. With no expert testimony regarding the loss of value of the property, the court has no way to calculate actual damages. Thus, no actual damages were suffered.

**Fraud**

In Texas a claim for common law actual fraud consists of the following elements:

(1) that a material misrepresentation or omission was made;
(2) the representation was false;

(3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion;
(4) the speaker made the representation with the intent that the other party should act upon it;
(5) the party acted in reliance on the representation; and
(6) the party thereby suffered injury.

*In re First Merit Bank,* 52 S.W.3d 749, 758 (Tex. 2001). The plaintiff retains the burden to establish with competent evidence *all* of the elements of fraud. *See e.g., In re Mercer,* 246 F.3d 391, 407–408 (5th Cir. 2001) (emphasis added).

A debt will be found non-dischargeable under section 523(a)(2)(A) if it arose from any debt for money, property, services to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. 11 U.S.C. § 523(a)(2)(A). The Fifth Circuit states "[a] creditor must prove the debtor's intent to deceive in order to obtain a non-dischargeability judgment under [ ] § 523(a)(2)(A)." *Friendly Fin. Service–Eastgate v. Dorsey (In re Dorsey),* 505 F.3d 395, 399 (5th Cir. 2007). To establish "false pretenses" or "false representations" under section 523(a)(2)(A) "the creditor must show (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party." *Jacobson v. Ormsby (In re Jacobson),* 2007 WL 2141961 (5th Cir. July 26, 2007).

The Plaintiff's case in chief rests almost entirely on the Seller's Disclosure Notice form filled out by Defendants on October 29, 2007, wherein the Defendants checked "No" to thirty-five boxes, indicating the property had never experienced various conditions, including intermittent or weather springs, previous flooding, soil movement, settling, and improper drainage. The Plaintiffs allege not only that the aforementioned conditions currently plague the property, but that they were also present when the Defendants owned and resided at 1416 Clairmont. Furthermore, the Plaintiffs assert the Defendants had been aware of the conditions, yet misrepresented and concealed such information during the sale. To establish the existence of these conditions and the Defendants' knowledge of them, the Plaintiffs submitted an audio recording of a telephone conversation that took place between Plaintiff Byron Meins and Defendant William Olden on May 12, 2010.[1] Utilizing the taped conversation, Plaintiffs supported their claims by cherry picking words and phrases relating to the water surrounding the property, emphasizing the Defendant's description of standing water in the yard as "very slow to drain" and "just holds water for a very long time." Relying on these statements, among others, Plaintiffs sought to build their entire case. In a phrase, their complaint doesn't hold water. When the court assessed the entirety of the conversation and paired it with the testimony presented in open court, it became clear that the Defendants lacked the requisite scienter to consider their box-checking as fraudulent.

First, the testimony and evidence submitted failed to establish the presence of intermittent or weather springs on the 1416 Clairmont property. Neither the taped conversation nor presented testimony indicated the Defendants possessed definitive knowledge of springs on either the Clairmont property or even in neighboring properties. Instead, the only presentation of any

---

[1] The Plaintiff recorded this conversation without the Defendant's knowledge or consent. The Plaintiff initiated the phone call and began the conversation with talk about family and soccer coaching tips. The tone of the conversation was that of a neighbor (the Plaintiff) seeking advice on a potential problem, moreso than a heated argument between adversaries.

evidence relating to springs was Defendant William Olden's mere speculation at the existence of a nearby spring or submersible pump, but such speculation is far below the level necessary to establish Olden knew or reasonably should have known of intermittent or weather springs. Moreover, the Plaintiffs failed to establish any evidence that an intermittent spring, weather spring, or a submersible pump had caused any of the alleged problems on the Clairmont property.

Second, the evidence failed to establish flooding had occurred on the property. While standing water was present on segments of the property, the level of water never appeared to reach "flood" levels under a plain meaning or common sense understanding of the word.[2] Both during testimony and on the recorded conversation, Defendant William Olden spoke of a single incident that was the result of a nearby construction site stacking debris, causing a backup of water that eventually overflowed, knocking over a fence, and disrupting mulch on the Clairmont property. However, as the incident was man-made and only a one-time occurrence, the Defendants didn't believe the property had suffered from the "condition" of previous flooding as outlined on the Seller's Disclosure form. Such a belief was reasonable given prior events on the property, and fails to reach the necessary level of knowing falsehood or reckless assertion.

Third, the evidence was insufficient to establish the existence of damages relating to soil movement and settling. Once the Plaintiffs indicated an interest in the Clairmont property, the Defendants provided a report by professional engineers Arias & Associates, fully describing the behavior and composition of the soil on the property. The Defendants had originally commissioned the report when they were building the house to serve as their own residence. Despite being furnished the report, during trial the Plaintiffs, again cherry picking from the telephone conversation, focused on the term "expansive" used by the Defendants in describing the soil, alleging that such "expansive" soil conditions should have been disclosed to the Plaintiffs prior to the sale. The disclosed Arias Report fully explained the situation of the soil, eliminating any element of misrepresentation or concealment. Further, no evidence was submitted to establish the soil was the root of the problems alleged by Plaintiffs.[3]

Finally, the allegations of improper drainage are unsupported by the evidence. When the Plaintiffs initially became interested in purchasing the Clairmont property, they had inquired about any "previous problems with water." In reply, the Defendant had assured them that "drainage and foundation engineered to take care of any problems related to water," explaining and presenting a site plan demonstrating the direction water would drain away from the house. Three years later, when the Plaintiff confronted the Defendant with allegations of improper drainage on the recorded conversation, the Defendant's reply was that of shock or surprise. That reaction, in conjunction with the presented testimony, help demonstrate the Defendants had never believed the Clairmont property suffered from improper drainage. Instead, the Oldens thought the presence of occasional slow-draining or standing water in the yard was simply the normal course of events. When filling out the Seller's Disclosure Notice, the Defendants indicated that the property suffered from no issues of improper drainage, *as they understood the*

---

[2] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 447 (10th ed. 2000) (defining flood as "rising and overflowing of a body of a water especially onto normally dry land; an overwhelming quantity or volume.").

[3] Testimony regarding the soil involved discussions "movement of an inch" when soil would expand or constrict due to rainfall or lack thereof. Without expert testimony, the court relies on its own knowledge of Texas hill country soil, and the soil present on the Clairmont property seems in no way unusual from other soil found in the region.

*meaning of that phrase*. Olden had immediately assumed that Mein's questions about drainage when he first looked at the property were focused on concerns about the effect of drainage on the foundation. There is no reason to believe that Olden had any different notion of its meaning on the Disclosure Notice, and Olden could not have known what Mein was reading into the phrase when he got the Disclosure Notice afterward.

As a final note, the Plaintiff never established that the residence or attached garage suffered from the effects of improper drainage. Instead, the evidence showed that only the surrounding yard suffered from slow draining or standing water when there was heavy rain. Such results appeared consistent with explanations made in the Arias Report and the site plan presented to the Plaintiffs—that water would be carried away from the residence and towards the rear of the property. The presence of the standing water is not sufficient to be categorized as "improper drainage" as used in the Disclosure Notice. Thus, even assuming the Defendants were aware of the conditions in the yard, they were not concealing incidents of improper drainage. The court concludes that the statements made on the Seller's Disclosure Notice fail to meet the level of fraud.

**Rescission and Damages**

Judicial rescission is "an equitable remedy used as a substitute for monetary damages when such damages would not be adequate." *Scott v. Sebree*, 986 S.W.2d 364, 368 (Tex. App.—Austin 1999, pet. denied). It operates "to extinguish a contract that is legally valid but must be set aside due to fraud, mistake, or for some other reason to avoid unjust enrichment" and to restore parties to the status they were in prior to execution of the contract. *Isaacs v. Bishop*, 249 S.W.3d 100, 109 (Tex. App.—Texarkana 2008, pet. denied).

Texas courts have long recognized the election of remedies—either to recover monetary damages or to elect the equitable remedy of rescission—when one is induced by fraud to enter into a contract. *Dallas Farm Machinery Co. v. Reaves*, 307 S.W.2d 233, 239 (Tex. 1957) ("one who is induced by fraud to enter into a contract has his choice of remedies. He may stand to the bargain and recover damages for the fraud, or he may rescind the contract, and return the thing bought, and receive back what he paid."); *Scott*, 986 S.W.2d at 368; *Nelson v. Najm*, 127 S.W.3d 170, 176 (Tex. App.—Houston 1st Dist. 2003). This election of remedies recognizes that "depending on the circumstances, a defrauded party may not be made whole by a recovery of actual damages, but instead may need an equitable remedy such as rescission." *Scott*, 986 S.W.2d at 368.

Plaintiffs in this case cite *Smith v. National Resort Communities, Inc.* for the proposition that there is "*less strictness*" in recognizing a right of rescission and restitution" when there is fraud involved. 585 S.W.2d 655 (Tex. 1979) (emphasis added); *see also Nelson*, 127 S.W.3d at 176-77 ("when there is fraud in the inducement to sign a contract…courts generally apply less strict standard when granting rescission or restitution"). In *Smith*, which involved a suit for rescission of a contract involving real estate, the lot in question was not usable for residential purposes—the purposes for which the seller promoted its sale and for which the property was purchased by the buyer—because of a fact unknown to the buyer and not disclosed by the seller. *Id.* at 656. In holding that the buyer established his right of rescission, the Supreme Court of Texas said that, under this "less strict" standard, the buyer was entitled to rescind the transaction

because the undisclosed fact was "basic and one which the seller knows his purchaser would regard as material." *Id*. at 658. The Court did not explain what this "less strict" standard was. Significantly, however, what the Court *did not say* was that there was no standard at all when granting rescission or restitution.

Even under this "less strict" standard, a court still has an independent duty to evaluate the equities in each case because rescission is an equitable remedy. It is not a matter of right. Rescission is "a harsh remedy and will not be upheld unless the relative equities, when weighed, clearly favor the party seeking rescission." *Little v. Kennedy*, 195 S.W.2d 255, 260 (Tex. App. 1946). When contemplating the remedy of rescission, a court "must weigh several factors to determine whether a party's request for equitable relief should be granted, including: probability of irreparable damage to the moving party in the absence of relief, possibility of harm to the non-moving party if the requested relief is granted, and public interest." *Davis v. Estridge*, 85 S.W.3d 308, 310 (Tex. App.—Tyler 2001, pet. denied). Thus, the court must consider the impact on the Defendant as well as the Plaintiff.

Plaintiffs contend they would not have to tender the house back to the Defendants until the purchase price of the house is returned, however, the Defendants have no available assets or money, hence their presence in bankruptcy court.[4] Instead of money damages, the Plaintiffs seek to receive a judgment, record it in San Antonio, and wait for the day when the Defendants eventually sell their home. The Plaintiffs would rest assured on the cowardice of title companies fearing abstract judgments, despite the homestead designation, in order to collect the funds from the judgment.[5] As a matter of policy, the Defendants should not be strapped with an abstract judgment that hinders them when they do seek to eventually sell their home, all the while the Plaintiffs continue to reside in the Clairmont property for essentially no cost (keeping in mind the Plaintiffs now allege this same property to be unlivable). Such facts do not favor equitable remedy. The Plaintiffs *rely* on receiving the remedy of rescission in order to actually get paid out of this suit, choosing to avoid money damages not because they would be inappropriate in this matter, but because rescission would net them a larger return. Rescission is a remedy designed to compensate when damages would not be appropriate, but the Plaintiffs here would seek rescission only in order to increase their money damages.

Furthermore, it is the moving party's burden "to prove that he is deserving of equitable relief, including showing that there is no adequate remedy at law." *Id*. at n. 2. It is essential that some injury or damage be shown in order to rescind a contract for fraud." *Russell v. Industrial Transp. Co*., 113 Tex. 441, 451 (Tex. 1924). In this case, plaintiffs failed to prove damages. For example, no expert testimony was offered to show what it would cost to fix the alleged drainage problem. This Court is left to speculate the extent to which the alleged drainage problem has reduced the value of the property. The evidence does not support plaintiffs' contention that slow

---

[4] Indeed, one of the reasons stated by the Plaintiffs for not hiring expert testimony is because there was no money in the Defendants, and thus costs could not be recouped.

[5] This case calls far short of actual and constructive fraud, so a trust would not be placed upon the home.

draining water in the backyard has totally destroyed the value of the house or made it unlivable. Landscaping, for example, might be good enough to fix the drainage problem, or simply the installation of a French drain (at a cost of less than $5,000). Rescission is certainly not the equitable remedy here. To the contrary, damages would be the right remedy in equity. Rescission would deliver a windfall to the plaintiffs and impose cost on the defendants all out of proportion to any harm caused. In other words, rescission on these facts would be inequitable.

Common law rescission also requires "notice and tender." *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 826 (Tex. 2012) ("rescission is not a one-way street. It requires a mutual restoration and accounting, in which each party restores property received from the other"). Before a buyer may rescind a contract, "he must give timely notice to the seller that the contract is being rescinded and either return, or, at least offer to return, the property received and the value of any benefit derived from its possession." *Estridge*, 85 S.W.3d at 311. The court of appeals in Texas said:

> It is well settled that any person demanding the rescission or cancellation of a contract to which he is a party, must restore or offer to restore to the other party whatever he may have received under the contract in the way of money, property or other consideration of benefit…In nearly all jurisdictions a bill is demurrable in which complainant does not offer to return any consideration which it shows he has received, or otherwise place defendant in status quo, or sufficiently excuse himself from that duty. The state of Texas is one of such jurisdictions where the rule obtains. It is the primary object in a suit for rescission or cancellation of a contract obtained by fraud to undo the original transaction and restore the former status of the parties. Hence, the complainant in a bill or petition must offer to restore to the defendant whatever property or valuable consideration he may have received under it, and the pleading without such averments is fatally bad. This is but the enforcement of the ancient rule of equity that he who seeks equity must do equity. *Casualty Reciprocal Exchange v. Bryan*, 101 S.W.2d 895, 897 (Tex. Civ. App. 1937).

In *Estridge*, the court held that it was an abuse of discretion to grant rescission of the real estate contract because the moving party failed to "tender the value that they obtained from using the property for the time period between the purchase and trial"[6] and "the trial court did not take into consideration the benefits gained by the Estridges." *Estridge*, 85 S.W.3d at 311. In this case, like *Estridge*, Plaintiffs failed to tender the value that they obtained from using the property in question.[7]

---

[6] "Benefits derived from possession of the property could include the rental value of the house, the lease value of the land, the benefit gained by running cattle on the land, the profit from growing a crop, such as hay, etc." *Id*. at n.3.

[7] Plaintiffs contend they tried to offer evidence of fair rental value at trial, but the court excluded it. The only evidence of fair rental value was offered through the testimony of Jenifer Mein, who said that they leased back the property to the Oldens for a week, following closing, for $500. This was not a fair rental

**DTPA and Statutory fraud**

Since there was no misrepresentation nor were any damages established, this court must find that, as a matter of law and fact, Plaintiff's DTPA and statutory real estate fraud actions fail as well.

In conclusion, the Plaintiff failed to establish the Defendant knowingly made false misrepresentations or omissions in the course of the sale of the 1416 Clairmont Property. Additionally, the Plaintiff failed to establish damages as a result of the allegations. Finally, had the Defendant been found to have made a fraudulent misrepresentation or omission, any request for the equitable remedy of rescission would be denied because damages would have been an appropriate remedy given the circumstances before the court.

For all of the foregoing reasons, the court rules in favor of the DEFENDANT. An order will be entered separately reflecting the judgment of the court.

---

value, but a forced, unique scenario. This was the only evidence offered, and it was excluded because it was not deemed helpful to the trier of fact.